**SO ORDERED.**

**SIGNED this 30 day of October, 2017.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:

| | |
|---|---|
| NICOLAOS P. SPIRAKIS | CASE NO. 13-07462-8-SWH |
| MARY C. SPIRAKIS | CHAPTER 11 |
|      DEBTORS | |

_____

NICOLAOS P. SPIRAKIS and
MARY C. SPIRAKIS
     PLAINTIFFS

  v.                                                    ADVERSARY PROCEEDING
                                                        NO. 14-00095-8-SWH

BANK OF NORTH CAROLINA,
     DEFENDANT

_____

LEARNING FOUNDATION OF WILMINGTON,
a North Carolina Partnership, and GEORGIA SPILIOTIS,
     THIRD-PARTY PLAINTIFFS/
     INTERVENORS

  v.

BANK OF NORTH CAROLINA, NICOLAOS P.
SPIRAKIS, MARY C. SPRIAKIS,
PANTELEIMON N. SPIRAKIS, and
MYRTLE BEACH COMMONS, LLC
     THIRD-PARTY DEFENDANTS.

1

**MEMORANDUM OPINION REGARDING DENIAL OF**
**MOTION FOR SUMMARY JUDGMENT**

The matter before the court is the motion for summary judgment filed by Georgia Spiliotis ("Georgia") and Learning Foundation of Wilmington (the "Partnership") regarding their subrogation and contribution causes of action in the above-named adversary proceeding. A hearing was held in Wilmington, North Carolina on May 25, 2017. At the conclusion of the hearing, the court took the matter under advisement, pending supplemental briefing by the parties. After a review of the case record and arguments presented at the hearing, the court entered an order denying the motion on September 29, 2017, Dkt. 147. This Memorandum Opinion sets forth the basis for that order.

**BACKGROUND**

Nicolaos P. Spirakis ("Nick") and Mary C. Spirakis ("Mary") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 3, 2013. Prior to the filing of the petition, Nick and Georgia executed an agreement in 1976 forming the Partnership, which operated a primary school in Wilmington, North Carolina. In 2001, Nick and Georgia purchased two pieces of real property in Wilmington as tenants-in-common, 3801 Wilshire Boulevard ("3801 Wilshire") and 3805 Wilshire Boulevard ("3805 Wilshire"), to construct a new school building. The Partnership subsequently purchased a third adjacent lot at 3809 Wilshire Boulevard ("3809 Wilshire") in 2002 for the same purpose.

Nick and Mary's son, Panteleimon N. Spirakis ("Peter"), formed a South Carolina limited liability company named Myrtle Beach Commons, LLC ("MBC") in 2008 for the purpose of constructing a commercial office building in Myrtle Beach, South Carolina. Peter sought financing for his construction project from the Bank of North Carolina ("BNC"). BNC first loaned Peter the sum of $400,000 on July 11, 2008 (the "First Loan") and extended a subsequent loan in January

2009 in the amount of $50,000 (the "Second Loan").  Peter then applied for a third loan with BNC in August of 2010 (the "Third Loan").  As a condition for making the Third Loan, BNC required additional personal guarantees and collateral. BNC prepared a new promissory note in MBC's name for the Third Loan, and two commercial loan modification agreements with respect to the First and Second Loans, in order to cross-collateralize all three existing loans (collectively, the "Debt").  Peter executed each instrument as the member-manager of MBC and also executed mortgage instruments encumbering MBC's real property in Myrtle Beach, South Carolina. Peter, Nick, Mary, and a corporation named Pegasus Construction, Inc. each guaranteed the Debt.

Additionally, in September of 2010, Nick and Georgia each signed and executed deeds of trust and assignments of leases and rents that granted BNC security interests in the properties located at 3801 Wilshire and 3805 Wilshire and the rents therefrom as collateral for the Debt.  Nick and Georgia, on behalf of the Partnership, also pledged the 3809 Wilshire property and rents to BNC as collateral for the Debt.  The deeds of trust were recorded in the New Hanover County Register of Deeds.  The third note and modification agreements further provided that the "Wilmington property [3801 Wilshire, 3805 Wilshire, and 3809 Wilshire] will be released when the collectible balance on [the Debt] all in the name of [MBC] is $175,000."   In 2012 or 2013, MBC defaulted on the Debt. BNC initiated foreclosure proceedings against the 3801 Wilshire, 3805 Wilshire, and 3809 Wilshire properties in July 2013.  In October 2013, the New Hanover County Clerk of Court issued an order permitting foreclosure as to all three properties.  Nick and Mary filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 3, 2013.  BNC filed three proofs of claims in the amounts of $504,309.25, $59,882.84, and $435,042.35, representing the respective balances owed on the First Loan, Second Loan, and Third Loan pursuant to Nick and Mary's personal

guarantees of the debt. On May 13, 2014, Nick and Mary initiated the instant adversary proceeding against BNC, seeking a judgment declaring BNC's deeds of trust and assignments of rents invalid and unenforceable as to 3801 Wilshire and 3805 Wilshire. Nick passed away in October of 2014.

In a motion filed on January 16, 2015, Dkt. 25, Georgia and the Partnership sought to intervene in this adversary proceeding, contending that their claims shared common questions of fact and law with Nick and Mary's claims against BNC. The court granted the motion to intervene in an order entered on April 16, 2015. Shortly thereafter, in May of 2015, Georgia exercised her right to purchase Nick's interest in the Partnership and interests in the real property located at 3801 Wilshire, 3805 Wilshire, and 3809 Wilshire for the price of $70,000 pursuant to a longstanding Partnership Buy-Sell Agreement (the "Agreement"). The court entered an order modifying the automatic stay in the lead individual bankruptcy case on April 30, 2015, in order to permit the transaction to take place. Upon payment of $70,000 in May 2015, Nick's interest in the Partnership was formally transferred to Georgia, and Georgia received deeds for Nick's one-half interests in the real property.

Georgia formed a North Carolina limited liability company in May 2015 named LFW Holdings, LLC (the "LLC"). She is the sole member-manager of the LLC and transferred all interests in the 3801 Wilshire, 3805 Wilshire, and 3809 Wilshire properties to the LLC in June 2015.

In December 2015, BNC reached a settlement agreement (the "Spirakis BNC Settlement") with Mary in her individual capacity and as a representative of Nick's estate, which was approved by the court in an order dated January 19, 2016, Dkt. 257.[1] The Spirakis BNC Settlement required

---

[1] BNC entered into a separate settlement with MBC, Peter, and Pegasus Construction, Inc., which required the sale of the South Carolina real property.

4

MBC to pay BNC the total amount of $450,000 in proceeds from the sale of the Myrtle Beach, South Carolina property. In exchange, BNC agreed to release Peter and Pegasus Construction from liability. As to Mary, BNC agreed that:

> Upon payment of the Settlement Fund [the $450,000 in sale proceeds] and approval by the Bankruptcy Court of this Agreement, Mary C. Spirakis will be released from all liability under the Loans.

Case No. 13-07462-8-SWH, Dkt. 248 at 8. As to Nick, the Spirakis BNC Settlement provided that:

> Pending resolution of the Adversary Proceeding by final non-appealable order or settlement approved by the Bankruptcy Court, [BNC] will agree to forbear against [MBC] and [Nick's estate]. When the Adversary Proceeding is concluded *by final non-appealable court order or court-approved settlement, regardless of the outcome*, Lender agrees not to sue Borrower or seek payment in the bankruptcy case from the assets of [Nick's estate] for default under the Loans or *otherwise seek repayment* of the obligations owed under the Loans directly from [MBC] or [Nick's estate].

Case No. 13-07462-8-SWH, Dkt. 248 at 8 (emphasis added). The Spirakis BNC Settlement was conditioned upon approval by the court and completion of releases as to claims against BNC by Nick's estate and Mary individually. *See* Case No. 13-07462-8-SWH, Dkt. 248 at 5. The parties executed the Spirakis BNC Settlement on December 23, 2015, and it was approved by the court in an order issued on January 19, 2016, Dkt. 257, thereby resolving and concluding Nick and Mary's claims against BNC.

At the time the Spirakis BNC Settlement was entered, nearly seven months after Georgia exercised her right to purchase under the Buy-Sell Agreement, Georgia's wholly-owned LLC was the owner of the properties at 3801 Wilshire, 3805 Wilshire, and 3809 Wilshire. In June 2016, Georgia sold 3809 Wilshire to a third-party purchaser. The sale resulted in $117,250 of net proceeds, which were placed in escrow pending resolution of her intervenor action against BNC.

5

In December 2016, Georgia entered into a separate settlement agreement with BNC (the "Spiliotis BNC Agreement"). At that point, BNC held three notes representing the First Loan (Note No. 10702), Second Loan (Note No. 11581), and Third Loan (Note No. 20039) and deeds of trust securing all three notes against the real property at 3801 Wilshire and 3805 Wilshire. Under the terms of the Spiliotis BNC Agreement, Georgia agreed to: (1) remit $100,250 of the 3809 Wilshire net sales proceeds to BNC; (2) remit all income received as rent during the year 2016 for the 3801 Wilshire property in the amount of $5,000; and (3) execute a modification of security instrument in order to secure the debt evidenced by BNC's Third Loan note with a renewed deed of trust against 3801 Wilshire and 3805 Wilshire. The modified security instrument limited BNC's recovery on the Third Loan debt secured by the property to $350,000. In exchange, BNC marked the First Loan note as paid and marked the Second Loan note as satisfied, thereby reducing the debt owed by Nick's estate and Mary (and secured by Georgia's LLC's property) by approximately $570,000.

Georgia remitted $100,250 following the sale of the 3809 Wilshire property as well as $5,000 in rental income from the 3801 Wilshire property to BNC. In total, Georgia contends that she has paid to BNC a total of $455,250 ($100,250 in proceeds from the 3809 Wilshire sale + $5,000 in 2016 rental income from 3801 Wilshire + renewed secured debt of $350,000, evidenced by the modification of security instrument), and she seeks subrogation as to all of BNC's collection rights against Nick's estate and against Mary individually for that amount. Specifically, Georgia contends that she is entitled to subrogation based on her payment of the debt owed by Nick's estate and Mary.

On February 27, 2017, Georgia and the Partnership filed their Motion for Summary Judgment, Dkt. 118, with respect to the following claims: (1) breach of fiduciary duty against Nick's

estate; (2) negligent misrepresentation against Nick's estate; (3) nondischargeability; (4) fraud against Peter; (5) subrogation against Peter, Mary, and Nick's estate; and (6) contribution against Peter, Mary, and Nick's estate.  In their response to the motion filed on April 3, 2017, Dkt. 128, the defendants also sought summary judgment as to the subrogation and contribution claims.

On May 25, 2017, a hearing was held on the motion for summary judgment.  At the hearing, all parties conceded that contribution was not appropriate under these facts, that additional discovery was necessary with regard to all claims except for subrogation, and that a determination of the subrogation claim should proceed.  At the conclusion of the hearing, the court invited the parties to submit supplemental briefing on the issue of legal subrogation.  Georgia submitted a memorandum in support on June 7, 2017, Dkt. 137, contending that her payments to BNC as part of the Spiliotis BNC Agreement entitle her to legal subrogation, such that she may exercise BNC's rights to collect from all defendants in the total amount she paid to BNC.

## DISCUSSION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment may be allowed "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); FED. R. BANKR. P. 7056.  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In making this determination, all conflicts are resolved by viewing the facts and

7

all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When ruling on a motion for summary judgment, the trial court has an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp.*, 477 U.S. at 323).

**I.       Legal Subrogation**

Subrogation is a common law doctrine that "allows a party who has compensated a creditor under the color of some obligation, to step into the shoes of the creditor, thereby succeeding to the creditor's rights to proceed against the debtor for reimbursement." *In re Declaratory Ruling by N.C. Comm'r of Ins.*, 134 N.C. App. 22, 24, 517 S.E.2d 134, 137 (1999) (citations omitted). A party seeking subrogation is, by default, seeking to recover for a debt paid on behalf of another.

In North Carolina, two types of subrogation exist: conventional and legal. Conventional subrogation, "so named from the convention or agreement of the civil law, is founded upon the agreement of the parties." *Joyner v. Reflector Co.*, 176 N.C. 274, 276, 97 S.E. 44, 46 (1918). In contrast, legal subrogation "does not stand entirely upon the notion of mutual contract, either expressed or implied." *Liles v. Rogers*, 113 N.C. 197, 198, 18 S.E. 104, 105 (1893) (citations omitted). Legal subrogation is an equitable remedy applied as a "means to substitute, to put one person in the place of another; and is usually exercised where one person has become liable for, or has been compelled to pay money for, another." *Vaughan v. Jeffreys*, 119 N.C. 135, 141, 26 S.E. 94, 96 (1896); *see also Joyner*, 176 N.C. at 278 (explaining that legal subrogation "is based upon payment, and exists where one who has an interest to protect, or is secondarily liable, makes

payment"). If imposed, "the party who is subrogated is regarded as entitled to the same rights, and indeed as constituting one and the same person with the creditor whom he succeeds." *Peek v. Wachovia Bank & Tr. Co.*, 242 N.C. 1, 15, 86 S.E.2d 745, 755 (1955) (internal citations omitted). As is true with other equitable remedies, the basis of legal subrogation is "the doing of complete, essential, and perfect justice between all the parties . . . and its object is prevention of injustice." *Journal Pub. Co. v. Barber*, 165 N.C. 478, 487, 81 S.E. 694, 698 (1914).

In this case, Georgia seeks summary judgment as to her claim to legal subrogation to BNC's rights against all defendants. No claim of conventional subrogation is before the court, and the parties conceded that the contractual agreements governing the Partnership do not explicitly provide for subrogation.

Legal subrogation is broadly applied and "called into operation by a variety of circumstances." *Beam v. Wright*, 224 N.C. 677, 682, 32 S.E.2d 213, 218 (1944) (citations omitted); *see also Boney v. Cent. Mut. Ins. Co.*, 213 N.C. 563, 568, 197 S.E. 122, 126 (1938) (explaining that the doctrine of legal subrogation "is broad . . . and has a very liberal application"). While legal subrogation is an expansive doctrine and many factors may be examined, the parties agree that five distinct elements should be considered: (1) a payment was made by the subrogee to protect [her] own interest; (2) the subrogee must not have acted as a volunteer; (3) the debt paid must have been one for which the subrogee was not primarily liable; (4) the entire debt must have been paid; and (5) subrogation must not work any injustice to others. *See Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 277 N.C. 216, 221, 176 S.E.2d 751, 755 (1970); *Beam v. Wright*, 224 N.C. 677 (1944); *Wallace v. Benner*, 200 N.C. 124, 130, 156 S.E. 795, 798 (1931); *Grantham v. Nunn*, 187 N.C. 394, 397, 121 S.E. 662, 664 (1924); *see also Frederick v. Southern Fidelity Mut. Ins. Co.*, 221

9

N.C. 409, 410 (1942) (applying South Carolina law and citing *Dunn v. Chapman*, 149 S.C. 163, 170, 146 S.E. 818, 820 (1929)).[1] Because subrogation is an equitable doctrine, it is "not an absolute right, but one which depends on the equities and attending facts and circumstances of each case." *First Union Nat'l. Bank v. Lindley Labs., Inc.*, 132 N.C. App 129, 130, 510 S.E.2d 187, 188 (1999) (citations omitted). Accordingly, the court will consider whether genuine issues of material fact exist with regard to each of the legal subrogation factors.

### A.   Payment Made to Protect Interests

The court begins with whether Georgia's payments to BNC, as required by the Spiliotis BNC Agreement, were made to protect her own interests. Subrogation is "applied where the person claiming its benefit has been compelled to pay the debt of a third person in order to protect his own rights, or *to save his own property*." *Liles*, 113 N.C. at 198 (emphasis added). Subrogation "may be invoked if the obligation of another is paid by the plaintiff for the purpose of protecting some real or supposed right or interest of his own." *Jamestown Mut. Ins. Co.,* 277 N.C. at 221 (1970). In general, courts find a payment to protect a pecuniary interest or property interest to establish the first factor. *Journal Pub. Co.,* 165 N.C. at 481 (holding that "the payer must have acted on compulsion to save himself from loss"). A subrogee may also satisfy the first factor and assert a personal interest if he or she is secondarily liable on the obligation in question. *Wallace v. Benner*, 200 N.C. at 127 (1931) (citing *Joyner v. Reflector Co.*, 176 N.C. 274, 97 S.E. 44 (1918)). The "determinative factor," and therefore the starting point for a court in considering equitable subrogation, is whether

---

[1] The Frederick decision applies South Carolina state law in setting out its five-factor analysis. While North Carolina courts do not impose this test per se, they do require a showing of each of these factors of an otherwise expansive and fact-intensive analysis. Here, the court relies on the Frederick court's language only for its utility in formulating the court's discussion, because these five factors provide a useful and pointed analysis of an otherwise broad doctrine.

10

a party made a payment on behalf of another to protect her own interest. *North Carolina Ins. Guar. Ass'n v. Century Indem. Co.*, 115 N.C. App. 175, 189,4 S.E.2d 464, 472 (1994).

    Here, Georgia entered into the Spiliotis BNC Agreement and performed according to its terms in order to prevent foreclosure of her property at 3801 Wilshire and 3805 Wilshire. She personally indebted herself to BNC in the amount of $350,000 and surrendered the majority of the net sales proceeds from 3809 Wilshire to this end. Absent her payment to BNC, BNC would have sought to enforce its rights pursuant to the 2010 deeds of trust, *i.e.*, foreclose upon the real property. Her payment to BNC in the form of the sales proceeds, rental income, and the granting of a modified security interest was made with the good faith intent to protect an actual interest and to protect her equity.

    While it may be clear that Georgia made the payments to protect her own interests, it is not as clear that the payments "were for the debt of another" at the time they were made. Georgia maintains that her payments were the result of a settlement she reached with BNC in December 2016. However, at that time, any payment made by Georgia could not have been on a debt owed by Mary, as her obligations to BNC were fully extinguished at that point. The focus of the inquiry is therefore whether Georgia's December 2016 payment to BNC was for a debt owed by Nick's estate.

    At that point and at present, any collection action by BNC against Nick's estate is temporarily in forbearance per the terms of the Spirakis BNC Settlement. Importantly, BNC has completely agreed not to seek repayment from Nick's estate, regardless of the outcome of the instant adversary proceeding. As a result, the debt owed by Nick's estate to BNC may continue for some period of time, but practically speaking, it cannot ever be enforced, no matter what conclusion is

11

reached by the court or on appeal. BNC's collection of Nick's estate's debt is merely in forbearance pending a final, non-appealable order. However, the court, for technical analysis purposes only, will deem the first criteria satisfied as to Nick's estate's obligation on the bare thread argument that a "debt of another" was paid to protect Georgia's interests.

### B. Subrogee Not a Mere Volunteer

In North Carolina, "one who is a mere volunteer . . . will not be permitted to avail himself of the relief afforded by the doctrine of subrogation." *Beam*, 224 N.C. at 684; *see also Wallace*, 200 N.C. at 130 (finding that "the principle of subrogation does not prevail in favor of a mere volunteer"). In the context of subrogation, a volunteer is defined as an individual "who, without any moral or other duty, pays the debt or discharges the obligation of another." *Nationwide Mut. Ins. Co. v. Am. Mut. Liability Ins. Co.*, 89 N.C. App. 299, 300, 365 S.E.2d 677, 678 (1988). An individual who makes such payment for the debt of another "in good faith . . . [and] 'under an erroneous impression of one's legal duty' is not a mere volunteer." *Id.* at 301 (citing *Boney v. Central Mut. Ins. Co.*, 213 N.C. at 567 (1938)); *see also Kennedy v. Atl. Tr. & Banking Co.*, 180 N.C. 225, 231 (1920) (denying subrogation where the proposed subrogee's payment was "more than voluntary; it was officious, in a legal sense"). Excepting volunteers from invoking subrogation serves to prevent unaffiliated individuals from gratuitously paying the debts of others and then seeking recovery from the original debtor.

This second subrogation factor is often interrelated with the first, as a subrogee making a payment to protect his or her own interests pursuant to the first factor is commonly under a duty, and not a mere volunteer, for purposes of the second factor. *Am. Gen. Fin. Services, Inc. v. Barnes*, 175 N.C. App. 406, 408 (2006), 623 S.E.2d 617, 619 (explaining that "the doctrine [of subrogation] will

not be invoked in favor of mere volunteers; rather, a plaintiff must show that he paid another's obligation for the purpose of protecting some real or supposed right . . . of his own"), *disc. rev. denied*, 360 N.C. 575, 635 S.E.2d 428 (2006).

In this case, Georgia was compelled to pay BNC and did not seek to satisfy gratuitously the Debt guaranteed by Nick, Mary, and Peter. She was not an intermeddling third party, as she became involved with the BNC transaction in 2010. Georgia sought to protect a legitimate interest and paid BNC out of necessity to prevent foreclosure of her real property. As a result, Georgia did not act as a mere volunteer. Again, although she was not a volunteer, Georgia did not pay the debt of another *vis-a-vis* Mary, and it is indeed questionable whether Nick's estate owed any debt on the date of Georgia's non-voluntary payment.

### C.     Primary Liability

To invoke subrogation, a subrogee must not have been primarily liable on the debt he or she paid on another's behalf. *See Beam v. Wright*, 224 N.C. at 683 (1944) (citations omitted) (explaining that equitable subrogation "arises when one person has been compelled to pay a debt . . . for which the other was primarily liable"). In North Carolina, a presumption exists that "a person who signs his or her name . . . on the face of a promissory note is a maker of that note and *is primarily liable* thereon." *Fed. Land Bank v. Lieben*, 86 N.C. App. 342, 346, 357 S.E.2d 700, 303 (1987) (emphasis added) (citations omitted). The presumption is rebuttable if the signatory on the note is able to demonstrate that "he signed the note as a surety, and not as [the] maker." *Id.*

On the other hand, a guaranty instrument imposes secondary liability, as it serves as "a promise to answer for the payment of a debt . . . in the event of the failure of another person who is himself primarily liable for such payment." *Branch Banking & Tr. Co. v. Creasy*, 301 N.C. 44, 52,

13

269 S.E.2d 117, 122 (1980). A guarantor is secondarily liable in that his "duty of performance [to pay] is triggered at the time of default of another." *Id.* (citations omitted); *see also Rouse v. Wooten*, 140 N.C. 557, 560, 53 S.E. 430, 431 (1906) (citing *Kearnes v. Montgomery,* 4 W. Va. 29 (1870) to explain that "the contract of a guarantor is collateral and secondary . . . [the guarantor] is responsible at once if the principal debtor makes default"). In addition, an individual's pledge of real property as collateral for another's debt does not give rise to personal primary liability. *See generally Branch Banking & Tr. Co.,* 301 N.C. at 52-53 (discussing situations in which primary liability arises).

Here, Georgia was *not* primarily liable on the Debt at the time of the BNC transaction in 2010 or at the time of her payment to BNC in late 2016. As the named entity and maker of the original promissory notes to BNC, MBC was primarily liable on the Debt at all times. Nick, Mary, and Peter were secondarily liable pursuant to their personal guarantees. In contrast, Georgia never executed a personal guarantee, and therefore did not directly subject herself to primary or secondary liability; rather, her involvement in the 2010 transaction was limited to the pledge of her interests in the real property as collateral for the Debt.

Nick and Mary contend that Georgia's purchase of Nick's Partnership interest in May of 2015 rendered Georgia primarily liable on the Debt. This contention is misplaced. While Georgia took Nick's one-half interest in the 3801 Wilshire, 3805 Wilshire, and 3809 Wilshire properties subject to the existing deeds of trust and assignments of rent, she did not explicitly assume the associated mortgages. At most, Nick's estate was secondarily liable for the Debt pursuant to his personal guarantee, and Georgia may have assumed only secondary liability to BNC. However, at the time of Georgia's payments to BNC, although she may have not been primarily liable on the debt as the term has been defined, she was, in effect, solely liable on the debt based upon BNC's

14

agreement to forbear all collection against Nick's estate. Georgia may technically be able to satisfy this element, but as is discussed below, to no avail.

### D.     Payment of Entire Debt

Subrogation is appropriate in cases where the entire debt at issue has been paid in full or otherwise discharged. The complete discharge of the debt at issue is "one of the prerequisites to the exercise of the right [to subrogation]." *Page Tr. Co. v. Godwin*, 190 N.C. 512, 517, 130 S.E. 323, 326 (1925) (citations omitted). Courts in North Carolina have consistently held that "as a general rule, . . . a person is not entitled to be subrogated . . . unless the debt has been paid in full." *Grantham v. Nunn*, 187 N.C. at 399 (1924). In other words, subrogation may be properly imposed "if [the subrogee] has discharged the burden, leaving the creditor nothing further to demand . . . ." *Journal Pub. Co.*, 165 N.C. at 491. Payment of the debt in full in cash is not required, and "in general it is sufficient if the balance of the creditor's debt has been otherwise satisfied." *Id.* North Carolina courts recognize the requirement to pay a debt in full is only "invoked for the protection of the creditor and never . . . in the interest of the debtor alone." *Grantham*, 187 N.C. at 399. If an individual who makes a "partial payment is subrogated pro tanto, he will occupy a position of equality with the holder of the unpaid part of the debt." *Id.* In effect, this requirement serves to prevent a subrogee from coexisting with the original creditor in holding a debtor liable.

At the outset of the bankruptcy case, BNC held three notes that were secured by deeds of trust on the properties in Wilmington and for which Mary and Nick's estate were secondarily liable. Upon execution of the Spirakis BNC Settlement and Spiliotis BNC Agreement, one note was marked paid and one note was marked satisfied. While not explicit in its language, the effect of the Spirakis BNC Settlement and resolution of the adversary proceeding in January of 2016 was a discharge of Nick and Mary's debt to BNC and relief from further liability.

15

Georgia executed a modification of security instrument in relation to the third note in the amount of $350,000, which is secured by a deed of trust against 3801 Wilshire and 3805 Wilshire Accordingly, Georgia's 2016 payments did not pay the Debt in full or discharge the burden; rather, her agreement merely recharacterized the Debt. BNC may still demand payment from her by enforcing its rights provided for in the security instrument modification. As a result, the Debt has not been paid in full, the burden has not been discharged, and the fourth factor is not satisfied.

### E.    Injustice as to Others

Finally, the court will consider whether imposing subrogation would work to the injustice of others. *Frederick*, 221 N.C. at 414. This requirement is generally considered in light of the remedy's roots in equity, so as to ensure the "doing of complete, essential, and perfect justice without regard to form." *Bank of N.Y. Mellon v. Withers*, 240 N.C. App. 300, 302, 771 S.E.2d 762, 764 (2015) (internal citations omitted); *see also In re Deuel*, 594 F.3d 1073, 1080 (9th Cir. 2010) (finding that "equitable subrogation would work an injustice by jumping" one creditor over others). In evaluating this factor, a court is to consider the actual effect of subrogation under the facts of an individual case. *Withers*, 240 N.C. App. at 303.

In this case, BNC will not suffer any harm if Georgia is permitted to subrogate to its rights, as it has effectively discharged the Debt owed by Mary and Nick's estate and resolved its claims against Georgia. However, allowing Georgia to invoke subrogation would result in an injustice as to Nick's estate and to Mary, as those parties entered into the Spirakis BNC Settlement in order to resolve their liability to BNC with finality. Permitting Georgia to subrogate to BNC's rights, and therefore initiate a collection action against Mary and Nick's estate, would impermissibly resurrect BNC's claims and amount to an undoing of the Spirakis BNC Settlement.

In addition, the 3801 Wilshire and 3805 Wilshire properties solely owned by Georgia's LLC are valued at $1,062,400. When she exercised her purchase option pursuant the Partnership Buy-Sell Agreement and acquired Nick's half-interest, Georgia received at least $530,000 in property for a purchase price of $70,000. That transaction is not subject to any challenge here, but in light of it, the court concludes that Georgia will not suffer any injustice by not being permitted to collect another $455,020 from Mary or Nick's estate.

## II.    Effect of Subrogation

The critical time to determine and define subrogation rights is when the payment for another is made. Prior to the payment, the parties involved are the original debtor, the original creditor, and the paying party. It is the payment that effectively triggers the right to subrogation and transforms the relationship amongst the parties to that of debtor, subrogor, and subrogee. If the subrogee invokes his right to subrogate, the "subrogor loses the rights, the subrogee gains them, and when gained by the latter, they are beyond the power of the former to modify . . . ." *Hinson v. Davis*, 220 N.C. 380, 383, 17 S.E.2d 348, 350 (1941).

Georgia relies on *Hinson v. Davis* for the proposition that "any modification or waiver of rights under subrogation to be effectual must be made by the subrogee and not by the subrogor." *Hinson*, 220 N.C. at 383. She contends that the releases contained in the Spirakis BNC Settlement are ineffective and inapplicable as to her because they were executed by BNC, who is now the subrogor, in 2015 before she made any payment pursuant to the Spiliotis BNC Agreement.

In *Hinson*, a workers' compensation insurance company was subrogated to the rights of an employer pursuant to a state statute. The insurance company was making the requisite payments to to an injured employee to trigger subrogation rights, and therefore qualify as a subrogee, such that it could bring a negligence action against a third-party pursuant to the statute. The employer-

17

subrogor then executed a separate release with the third-party defendant. The Supreme Court of North Carolina held that at the time when the release was executed, the subrogee's rights, as determined and outlined in the statute, could not be modified by an agreement. *Id.* at 383 (finding that the "subrogated right in the [subrogee] could not by any act of the [subrogor] be altered"). *Hinson* differs materially from the facts at hand, as the insurance company's subrogation rights were fully vested at the time of the execution of the third-party release, and the terms of the statute established the subrogated right to bring suit and seek damages. In contrast, in this case, Georgia's hypothetical right to subrogate did not vest until she executed the Spiliotis BNC Agreement in 2016, and she is seeking to subrogate based on equity rather than a statute. In this case, the future subrogor (BNC) already modified its rights before the settlement with the future subrogee (Georgia).

In general, a subrogee is "entitled to be placed in the precise position of the one to whose rights he is subrogated, and is entitled to all the rights and securities and to the benefit of all the remedies which were available to such [creditor] for payment of the debt . . . ." *Montsinger v. White*, 240 N.C. 441, 444, 82 S.E.2d 362, 365 (1954) (citations omitted). An individual "for whose benefit the doctrine of subrogation is invoked and exercised can acquire no greater rights than those of the party for whom he or she is substituted." *Liles*, 133 N.C. at 201 (citations omitted). Courts have interpreted this to mean that if a subrogor had no rights to recover against a debtor, the subrogee equally has no rights to recover. *Id.* at 202*; see also Dowdy v. S. Ry. Co.*, 237 N.C. 519, 525, 75 S.E.2d 639, 643 (citations omitted) (explaining that "a party can acquire no better right by subrogation than that of the principal").

Here, BNC effectuated a settlement with Nick's estate and Mary on December 23, 2015, which was approved by the court on January 19, 2016. The Spirakis BNC Settlement expressly reserved Georgia's rights and did not preclude her from seeking subrogation. However, in invoking

18

her right to subrogation, Georgia takes BNC's rights as they existed on the date of her payment in December of 2016. At that point, BNC had already released Mary from liability under the Debt. As a result, even if the court permitted her to invoke subrogation, Georgia may not hold Mary liable for any portion of the Debt. Furthermore, she must forbear any collection action against Nick's estate pending conclusion of the adversary proceeding, *notwithstanding its result*, after which she still may not seek repayment of any portion of the Debt from his estate.

Georgia's purported subrogation rights vested in December 2016 upon her payment to BNC. As a result, when the Spirakis BNC Settlement was executed in 2015, she was not yet a subrogee and BNC was not yet a subrogor. BNC entered into the Spirakis BNC Settlement as an ordinary creditor and waived its rights to recover against Nick's estate, Mary, and MBC. BNC's waiver of its rights was entirely permissible at the time, and the court approved the Spirakis BNC Settlement as being in the best interests of the estate, BNC, and all other creditors. As a subrogee, Georgia takes BNC's rights as they existed in December 2016 and is bound by the terms of the Spriakis BNC Settlement. By virtue of the terms of the settlement, the collection rights to which Georgia seeks to be subrogated were effectively extinguished.

## CONCLUSION

Based on the foregoing, the court finds that Georgia may not be able to satisfy all elements of legal subrogation. Moreover, and alternatively, even if she could, the collection rights to which she would be subrogated effectively no longer exist, and the remedy she seeks is no longer available.

Georgia's Motion for Summary Judgment on the claim of subrogation is DENIED, and summary judgment will be entered in favor of Mary, Nick's estate, Peter, and MBC.

**END OF DOCUMENT**